UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| EYETALK365, LLC, <br><br>  Plaintiff, <br><br> vs. <br><br> ZMODO TECHNOLOGY CORP. LIMITED, <br><br>  Defendant. | 2:17-cv-02714-RCJ-PAL <br><br> **ORDER** |

This case arises out of the alleged infringement of a patent for an audio-video doorbell system. The parties have asked the Court to construe several claim terms.

## I.  FACTS AND PROCEDURAL HISTORY

Plaintiff Eyetalk365, LLC ("Eyetalk") is a North Carolina company with its principle place of business in that state. (Compl. ¶ 2, ECF No. 1). Eyetalk is the assignee of U.S. Patent No. 9,432,638 ("the '638 Patent") entitled "Communication and Monitoring System," which issued on August 30, 2016. (*Id.* ¶¶ 11–12). Defendant Zmodo Technology Corp. Limited ("Zmodo") is a Nevada company with its principle place of business in Illinois. (*Id.* ¶ 3).

Eyetalk sued Zmodo in the Western District of North Carolina, alleging direct infringement of claims 1 and 6 of the '638 Patent in violation of 35 U.S.C. § 271(a) "by making, using, offering for sale, selling, and/or importing [infringing] devices in the United States," (*id.*

¶ 13), as well as inducing infringement of those claims in violation of 35 U.S.C. § 271(b), (*id.* ¶ 21). Zmodo answered and filed counterclaims for declaratory judgment of non-infringement and invalidity under §§ 101, 102, 103, and 112. (Answer & Countercl., ECF No. 15). Both parties demanded a jury.

Zmodo moved to dismiss for failure to state a claim under 35 U.S.C. § 101 and also moved for summary judgment, arguing the effective filing date of the '638 Patent was March 24, 2015 and that claims 1–20 were invalid under § 102(a)(1) as anticipated by U.S. Patents Nos. 7,193,644; 8,154,581; and/or 8,164,614. Eyetalk answered the Counterclaim and moved to dismiss Zmodo's fourth through ninth affirmative defenses for failure to satisfy Rule 8(c). Chief Judge Whitney of the Western District of North Carolina denied the dispositive motions without prejudice as premature. This Court has since denied the motions to dismiss and declined to address any motions for summary judgment until after claim construction.

Soon after the Supreme Court decided *TC Heartland*, Zmodo filed a motion to dismiss or transfer because it resided in the District of Nevada and had no regular and established place of business in the Western District of North Carolina. *See* 28 U.S.C. § 1400(b); *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1520–21 (2017). Chief Judge Whitney granted the motion in part, transferring the case to this District. The case was randomly assigned to Judge Dorsey but immediately randomly reassigned to this Court because Judge Dorsey was not a patent pilot program judge.[1] Claim construction briefing was completed before transfer. The Magistrate Judge ordered the parties to address the issue in a joint case management report,

---

1 Judge Du and the undersigned jointly reassigned related Case No. 3:17-cv-686 from Judge Du to this Court. In that case, Eyetalk sued Zmodo in this District for infringement of U.S. Patents Nos. 9,485,478; 9,516,284; 9,635,323; 9,706,178; and 9,648,290, all of which are also entitled "Communication and Monitoring System." Zmodo has answered in that case, but there have yet been no pretrial motions or claim construction briefs filed.

but the parties disagreed in that report as to whether the Court should conduct claim construction immediately in the present case or wait until the related case is fully prepared for claim construction and hold a consolidated hearing. The Court will delay no longer and now construes the disputed claim terms.

## II. CLAIM CONSTRUCTION STANDARDS

The construction of patent claim terms is a question of law to be determined by a court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Consequently, courts construe claims in the manner that "most naturally aligns with the patent's description of the invention." *Id.*

The first step in claim construction is to look to the language of the claim itself. A disputed claim term should be construed in light of its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily apparent, and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Moreover, a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *U.S. Surgical Corp. v.*

*Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"); *see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in a refusal to construe "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in a refusal to construe "irrigating" and "frictional heat"). There is a "heavy presumption" that claim terms carry the meanings a person skilled in the relevant art would customarily attribute to them. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1355 (Fed. Cir. 2004).

Claim construction may deviate from the ordinary and customary meaning of a disputed term only if: (1) "a patentee sets out a definition and acts as his own lexicographer"; or (2) "the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Ordinary and customary meaning is not always the same as the dictionary definition. *Phillips*, 415 F.3d at 1321.

> Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* "Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is therefore "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of claims." *Phillips*, 415 F.3d at 1315. Courts can also look to the prosecution history as part of the intrinsic record to determine how the Patent

Office and the inventor understood the patent. *Id.* at 1317.  However, the prosecution history lacks the clarity of the specification and is often less useful for claim construction purposes. *Id.*

"A court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 980 (internal citations and quotation marks omitted).  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.*  Although such evidence may aid the court in construing claim terms, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.  Thus, "while extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks omitted).

Finally, a claim can be ruled indefinite under 35 U.S.C. § 112 if "read in light of the specification delineating the patent, and the prosecution history, [the claim] fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (overruling the Court of Appeals' previous "amenable to construction" and "insolubly ambiguous" standards).  "Whether a claim complies with the definiteness requirement of 35 U.S.C. § 112 ¶ 2 is a matter of claim construction . . . ." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).  The amendment to § 112 via the Leahy–Smith America Invents Act did not alter the definiteness requirement. *Compare* 35 U.S.C. § 112 ¶ 2 (1952), *with* 35 U.S.C. § 112(b) (2012).

///

///

## III. ANALYSIS

### A. Withdrawn Disputes

The parties have stipulated that "storage hierarchy" (9),[2] "defined hierarchy of storage" (11), and "hierarchy of storage" (20) require no construction.

### B. Disputed Terms

Claim 1 of the '638 Patent reads in full:

1. A method for receiving a person at an entrance, comprising the steps of:

    (a) detecting the presence of a person at the entrance;

    (b) transmitting, to a computerized controller running a software application, video of the person at the entrance recorded using a camera located proximate the entrance; and

    (c) providing, with the software application running at the computerized controller, a graphical user interface to a remote peripheral device by which a user of the remote peripheral device, which comprises a cell phone, may view the video of the person at the entrance;

    wherein said detecting of step (a) comprises using a wireless video camera comprising a microphone, a speaker, an RF receiver, an RF transmitter, a proximity sensor and uses a keypad comprising one or more buttons to determine that the person is present at the entrance wherein said transmitting of step (b) comprises transmitting digital streaming video wirelessly using the video camera;

    (d) sending an alert to the cell phone that the person is present at the entrance after the keypad is pressed by the person at the entrance;

    (e) speaking with the person at the entrance through the graphical user interface on the cell phone after the keypad is pressed by the person at the entrance; and

    (f) listening to the person at the entrance via the cell phone through use of the graphical user interface after the keypad is pressed by the person at the entrance.

---

[2] The Court will identify the number of the claim in which a disputed claim term appears in parentheses following the disputed term.

U.S. Patent No. 9,432,638 col. 20 ll. 22–50.

   **1.    peripheral device (6)**

Eyetalk argues the term should be construed as "an electronic communication device such as a video phone, an in-car communication system, a telephone, a cell phone, a personal computer, or a smartphone/personal digital assistant (PDA)." Zmodo argues no further construction is necessary. The specification includes no definition of "peripheral device," so the heavy presumption that the term means whatever a person skilled in the art would interpret it to mean has not been rebutted. The specification includes the following exemplary language:

> Such devices generally include video phones 72; in-car communication systems such as the well known ONSTAR system 74 currently found in GM cars; telephones 76; cell phones 77; personal computers 78; smartphones/personal digital assistants (PDAs) 79; and other similar communication devices. Each remote peripheral device is configured for electronic communication with the personal computer 80 via at least the PSTN connection 70 or the broadband connection.

U.S. Patent No. 9,432,638 col. 9 ll. 23–31. Although a patentee may define words as he likes, examples given in a specification should not be read into claims. *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988). The Court agrees with Zmodo that no further construction of this term is necessary.

   **2.    graphical user interface (1)**

Eyetalk argues no further construction is necessary. Zmodo argues the term should be construed as "a user interface that contains interactive graphical elements, such as icons, windows, buttons, and/or switches, with which a user physically interacts via an input device in order to provide an input to a computer software program." The specifications mention the term only twice and include none of the language suggested by Zmodo, nor any other definitional or exemplary language. The term "graphical user interface" is well understood by those skilled in

the art, and the Court will not import language from an extrinsic source into the claim where unnecessary to understand the scope of intrinsic evidence.

### 3. providing, with the software application running at the computerized controller, a graphical user interface to a remote peripheral device (1)

Eyetalk argues no further construction is necessary. Zmodo argues the term should be construed as "running the software application at the computerized controller provided to the remote peripheral device the software code for displaying the graphical user interface on a display screen of the remote peripheral device." The Court agrees with Eyetalk. Zmodo's proposed construction is primarily an unhelpful rewording of the claim language. It also proposes to add the element of "displaying the graphical user interface on a display screen of the peripheral device." But that is superfluous. A person skilled in the art would understand that a visual display is inherent to a graphical user interface. Also, the claim is not limited to display on a "screen," at least not as to "remote peripheral device[s]." It is conceivable that a graphical user interface could be displayed via an element other than a "screen." The specifications only use the word "screen" when referring to the LCD display that is part of the "DVMS module[s]," (the wireless doorbell exterior to the home and the control station(s) interior to the home), *see* U.S. Patent No. 9,432,638 cols. 8–9 & figs. 1–3, not when referring to the "remote peripheral device[s]" such as video phones, in-car communications systems, and the like. "Remote peripheral device[s]" are referred to throughout the specifications with no reference to whether they must include a "screen." It is those remote peripheral devices that utilize the graphical user interface provided by the "controller[s]" (the DVMS module(s) inside the house). Although most such devices will in fact have a screen (at least today in 2018), it is conceivable they will not always. The claim is not so limited, and Zmodo's construction would improperly add the limitation.

**4.     a wireless video camera (1)**

Eyetalk argues no further construction is necessary. Zmodo argues the term "wireless video camera" should be construed as "a wireless video camera separate and apart from the 'camera located proximate the entrance' recited in step (b) of the method." The Court agrees with Eyetalk. The parties do not appear to dispute that one skilled in the art would understand the term to mean a camera that transmits video wirelessly, i.e., via the emission of electromagnetic waves into the air. Zmodo asks the Court to construe the claim to only include those systems where the camera used to "detect[] the presence of a person at the entrance," *id.* col. 20 l. 24, is different from the "camera located proximate the entrance," *id.* col. 20, ll. 27–28. The Court rejects Zmodo's proposed construction. Claim 1 read as a whole makes it reasonably clear that the claim is not limited by having different cameras for initially detecting persons at the entrance and monitoring them thereafter.

Step (c) makes clear that the detection in step (a) uses the "wireless video camera" described in step (c). *Id.* col. 20, ll. 34–35. Step (b) describes a "a camera" used to record video of the person after detection. *Id.* col. 20, l. 27. To be sure, the claim could be better drafted. Ideally, the limitations in the "wherein" paragraph in step (c) would be incorporated into steps (a) and (b), as applicable. The examiner might have avoided this issue by objecting to the use of "a" to introduce "wireless video camera" on lines 34–35 in step (c) after "a" had already been used to introduce "camera" on line 27 in step (b). It is a fundamental rule of practice that the proper antecedent basis in a patent claim for an element that has already been introduced is "the," not "a." The use of "a wireless video camera" might therefore cause one to think that this element is intended to be separate from "a camera" as previously introduced, especially given the additional term language of "wireless video." Zmodo does not argue the claim is indefinite for

this reason alone, however, nor could it. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n.*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) ("When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'"). Rather, Zmodo simply asks the Court to hold the drafter to his word and interpret the claim to comprise two separate cameras. But although sloppily drafted, the Court believes one skilled in the art would perceive the claim as a whole to include embodiments of the invention with a single wireless video camera, which is the element described as "a camera" in step (b) and further described as "a wireless video camera" in step (c). The claim covers embodiments both where the "wireless video camera" used to detect the person at the entrance is the same or different from the "camera" used to record video of the person. The claim is not limited to one or the other embodiment.

**5. wherein said detecting of step (a) comprises using a wireless video camera comprising a microphone, a speaker, an RF receiver, an RF transmitter, a proximity sensor and uses a keypad comprising one or more buttons to determine that the person is present at the entrance (1)**

The parties do not ask the Court to construe the term, but Zmodo argues the term is indefinite under § 112 because the claim uses both "using" and "uses." The question is whether the limitations of the claim are reasonably certain to a person skilled in the art. Zmodo is correct that a plausible reading of the claim is that the "detecting of step (a) . . . uses a keypad comprising one or more buttons to determine that the person is at the entrance." That implies that detection does not happen until the person at the entrance pushes "one or more buttons" on the keypad, perhaps in addition to triggering the "proximity sensor." The specifications indicate use of a keypad by a visitor. Moreover, step (d) requires that a visitor press one or more buttons on the keypad before the owner is alerted to the person's presence. The term is therefore not

indefinite. Although poorly worded, the term limits the claim with reasonable clarity by requiring detection to be accomplished by the visitor pressing one or more buttons on the keypad. A device where detection is accomplished through some other method, i.e., via mere presence of the visitor or any other method not requiring the visitor to press buttons, does not infringe Claim 1. For ease of reading, the Court will construe the claim as follows: "wherein said detecting of step (a) comprises using: (1) a wireless video camera comprising a microphone, a speaker, an RF receiver, an RF transmitter, and a proximity sensor; and (2) a keypad comprising one or more buttons."

> **6.    wherein said transmitting of step (b) comprises transmitting digital streaming video wirelessly using the video camera (1)**

The parties do not ask the Court to construe the term. Although Eyetalk in its brief anticipated that Zmodo would challenge this term as indefinite, Zmodo has not argued this term in its brief, so the Court will not address it.

> **7.    sending an alert to the cell phone that the person is present at the entrance after the keypad is pressed by the person at the entrance (1)**
>
> **speaking with the person at the entrance through the graphical user interface on the cell phone after the keypad is pressed by the person at the entrance (1)**
>
> **listening to the person at the entrance via the cell phone through use of the graphical user interface after the keypad is pressed by the person at the entrance (1)**

The parties do not ask the Court to construe the term, but Zmodo argues the terms are indefinite under § 112 because the phrase "after the keypad is pressed by the person at the entrance" is repeated after each of steps (d)–(f). Zmodo argues it is not reasonably clear whether the person at the entrance must push one or more buttons before each of steps (d)–(f) or only before step (d). Although the repetitive language is poor drafting, the Court finds that it would be reasonably clear to a person skilled in the art that the visitor need only press the button(s)

once. Step (c) makes reasonably clear that detection happens upon the visitor pressing the button(s). It makes no sense that after an alert has been sent to the owner in step (d) in response to the button pressing in step (c), that the visitor must then press a second button so that the owner can speak under step (e) and press a third button so that the owner can listen under step (f). No reasonable layperson reading the entire '638 Patent would think that the invention is so limited, much less a person skilled in the art, and the claim is reasonably clear that additional buttons need not be pushed at each step. No language such as "again," "additional," or "a second/third time" is used in steps (e)–(f).

> **8. The method of claim 1 further comprising the steps of viewing of the streaming video in real time through use of the software application on the cell phone and storing the timestamped video or audio messages received by an exterior module in a database for later viewing, and sending messages to a plurality of peripheral devices that the person is present at the entrance (2)**

The parties do not ask the Court to construe the term. Although Eyetalk in its brief anticipated that Zmodo would challenge this term as indefinite, Zmodo has not argued this term in its brief, so the Court will not address it.

> **9. wherein said at least one peripheral device comprises a cellular phone and is configured to display the video transmitted wirelessly by the camera, receive a message from the person transmitted wirelessly by the camera, receive and display an alert transmitted wirelessly from the exterior device after pressing of the keypad by the person to the user, and speaking with the person at the door using the software application running on the cellular phone (6)**

The parties do not ask the Court to construe the term, but Zmodo argues the term is indefinite under § 112. Claim 6 reads in full:

> 6. A detection and viewing system comprising:
>
> **an exterior device** located proximate a door comprising **a camera**, a microphone, a speaker, an RF receiver, an RF transmitter, a proximity detector, and a keypad comprising one or more buttons operable **to wirelessly transmit streaming video data** after the keypad is pressed by a person at the door;

a software application running on at least one peripheral device, wherein each of said at least one peripheral device is associated with a respective user;

a computer configured for wireless communication with the exterior device to receive digital video data, wherein said computer is configured for communication with each of said at least one peripheral device to transmit the digital video data to said at least one peripheral device;

and wherein said at least one peripheral device comprises a cellular phone and is configured to display **the video transmitted wirelessly by the camera**, receive a message from the person transmitted wirelessly by the camera, receive and display an alert transmitted wirelessly from the exterior device after pressing of the keypad by the person to the user, and speaking with the person at the door using the software application running on the cellular phone.

U.S. Patent No. 9,432,638 col. 21 ll. 10–35 (emphases added).

Zmodo argues that it is not reasonably clear whether the "exterior device" or the "camera," which is an element thereof, transmits the video. The Court finds that it would be reasonably clear to a person skilled in the art that it is the "RF transmitter" that transmits the video. It is correct to say that the "exterior device . . . wirelessly transmit[s] streaming video data," however, because the "RF transmitter" is an element of the "exterior device." The later statement that "at least one peripheral device comprises a cellular phone and is configured to display the video transmitted wirelessly by the camera" creates no substantial confusion. The phrase "transmitted wirelessly by the camera" is an adjective phrase. It is not introduced as a step in a process or as an element of a machine. Although "the transmitted video" would be a better choice of words, the phrase used refers to the video transmitted by the "exterior device," i.e., the "RF transmitter" of the "exterior device," with reasonable clarity.

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the disputed terms are construed as follows:

1. peripheral device (6) — **no further construction necessary**

2. graphical user interface (1) — **no further construction necessary**

3. providing, with the software application running at the computerized controller, a graphical user interface to a remote peripheral device (1) — **no further construction necessary**

4. a wireless video camera (1) — **no further construction necessary**

5. wherein said detecting of step (a) comprises using a wireless video camera comprising a microphone, a speaker, and RF receiver, an RF transmitter, a proximity sensor and uses a keypad comprising one or more buttons to determine that the person is present at the entrance (1) — **wherein said detecting of step (a) comprises using: (1) a wireless video camera comprising a microphone, a speaker, an RF receiver, an RF transmitter, and a proximity sensor; and (2) a keypad comprising one or more buttons**

6. sending an alert to the cell phone that the person is present at the entrance after the keypad is pressed by the person at the entrance (1)

   speaking with the person at the entrance through the graphical user interface on the cell phone after the keypad is pressed by the person at the entrance (1)

   listening to the person at the entrance via the cell phone through use of the graphical user interface after the keypad is pressed by the person at the entrance (1) — **no further construction necessary**

7. wherein said at least one peripheral device comprises a cellular phone and is configured to display the video transmitted wirelessly by the camera, receive a message from the person transmitted wirelessly by the camera, receive and display an alert transmitted wirelessly from the exterior device after pressing of the keypad by the person to the user, and speaking with the person at the door using the software application running on the cellular phone (6) — **no further construction necessary**

IT IS SO ORDERED.

Dated this 17th day of May, 2018.

_____
ROBERT C. JONES
United States District Judge